UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ANNIE LEE OLIVER, et al.,                )
                                         )
                                         )
            Plaintiffs,                  )      Case No.  1:19-CV-137-ACL
                                         )
     vs.                                 )
                                         )
PEMISCOT COUNTY, et al.,                 )
                                         )
            Defendants.                  )

**<u>ORDER</u>**

Plaintiffs Annie Lee Oliver, Jeremy Wright, and the Estate of Michael Benford filed this action against the following Defendants: Tommy Greenwell, Pemiscot County, Joan Prater, Rivan Hill, David Stewart, Josh Bost, Michael Coleman, Richard Cobbs, Terry Armstrong, Officer Unknown Crooks, Torrance Akins, Chad Nixon, and Ron Warren   ("Pemiscot County Defendants"); and Advanced Correctional Healthcare, Inc. ("ACH"), Charles Pewitt, and Kristin Tate ("ACH Defendants").  Plaintiffs allege multiple violations of federal law under 42 U.S.C. § 1983, as well as state claims, related to the death of Michael Benford after allegedly being denied necessary medical treatment at the Pemiscot County Jail ("PCJ").

Presently pending before the Court are the ACH Defendants' Motion to Exclude Testimony (Doc. 96), and Motion for Summary Judgment (Doc. 102); and the Pemiscot County Defendants' Motion to Exclude Testimony (Doc. 99), and Motion for Summary Judgment (Doc. 105).  These Motions are fully briefed and ready for disposition.

## BACKGROUND

On August 13, 2019, Plaintiff Annie Lee Oliver filed her original *pro se* Complaint against Defendants Greenwell, Pemiscot County, Does 1 through 10, and Pemiscot County Jail. (Doc. 1.)  On December 4, 2019, Plaintiffs Oliver, Jeremy Wright and the Estate of Michael Benford filed their First Amended Complaint against Defendants Greenwell, Pemiscot County Josh Bost, Michael Coleman, Richard Cobbs, Terry Armstrong, Kristin Tate, Officer Crooks, Torrance Akins, Chad Nixon, Ron Warren, and Does 1 through 10.  (Doc. 6.)  The Court granted Plaintiffs leave to file a Second Amended Complaint, which added Joan Prater, Rivan Hill, David Stewart, Charles Pewitt, and ACH, on April 8, 2021.  (Doc. 27.)

On April 21, 2022, the Court dismissed Claim Six (a Missouri wrongful death claim), and Claim Seven (a Missouri lost change of survival claim) due to Plaintiffs' failure to comply with the statutory affidavit requirement.  (Doc. 58.)

The following claims remain in this action: (1) violation of Fourteenth Amendment Due Process under § 1983 for failure to provide medical care; (2) violation of Fourteenth Amendment Due Process under § 1983 for deprivation of familial association; (3) violation of Eighth Amendment under § 1983 for failure to provide adequate medical care of pretrial inmate; (4) conspiracy to violate civil rights in violation of 42 U.S.C. §§ 1983, 1988; and (5) unconstitutional policy, custom or procedure under *Monell* in violation of § 1983.

The Defendants filed the instant motions in January 2023, but the motions were stayed pending the Court's resolution of multiple discovery disputes that will not be detailed herein. Defendants request judgment as a matter of law on all of Plaintiffs' remaining claims.

## I.      Motions to Exclude

The Defendants have separately filed motions to exclude the testimony of Plaintiffs'

designated jail and police procedures expert, Roger Clark.

## <u>Legal Standard</u>

The admission of expert testimony in federal court is governed by Federal Rule of

Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702.

The rule was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579 (1993), which charged trial judges with a "gatekeeping" role to screen expert testimony

for relevance and reliability.  *Id.* at 590-93; *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th

Cir. 2012).  To satisfy the relevance requirement, the proponent must show that the expert's

reasoning or methodology was applied properly to the facts at issue.  *Barrett v. Rhodia, Inc.*, 606

F.3d 975, 980 (8th Cir. 2010).  To satisfy the reliability requirement, the party offering the expert

testimony must show by a preponderance of the evidence both that the expert is qualified to

render the opinion and that the methodology underlying his conclusions is scientifically valid."

*Id.*

3

A district court has "great latitude" in determining whether expert testimony meets the requisites of FRE 702." *Allen v. Brown Clinic, P.L.L.P.*, 531 F.3d 568, 573 (8th Cir. 2008). In ascertaining whether expert testimony will reliably aid the trier of fact, the Court should examine factors pertinent to the case, including whether the proposed expert sufficiently connects the proposed testimony with the facts of the case. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009)

The Court in *Daubert* emphasized that the inquiry required by FRE 702 is intended to be flexible. 509 U.S. at 594. Accordingly, the Eighth Circuit has held that expert testimony should be liberally admitted, with any doubts resolved in favor of admissibility. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596.

**Discussion**

In his report (Doc. 97-1), Mr. Clark provides the following opinions, which are the subject of Defendants' Motions:

1. []In my opinion, the death of Mr. Benford was totally preventable and the conduct of all of the involved PCJ administrators, supervisors and staff demonstrated shocking and deliberately callus disregard for his life and safety for which neither the facility policy and procedures nor the personnel involved should be excused or forgiven.[1] ("Opinion 1")

2. All PCJ personnel were given obvious and sufficient cause to closely monitor Mr. Benford's health from the moment he entered into the PCJ — This did not occur. Given the totality of circumstances and the knowledge PCJ personnel had of Mr. Benford's health disabilities, procedures should have existed that would have, at the

---

[1]This opinion is preceded by eight sentences of background, which the undersigned has omitted in the interest of brevity.

minimum, sent Mr. Benford for evaluations of his blood pressure and heart monitoring.  ("Opinion 2")

3.  Mr. Benford's obvious susceptibility to heart attack and/or death was not sorely restricted to the PCJ medical staff.  Every PCJ Deputy was required to know that his condition is a condition covered in all custodial first aid curriculums (as cited above).  In this case it is clear that Mr. Benford's booking histories, notice from family, fellow inmates, and physical symptoms of distress were so obvious that they were a matter of simple common sense among the entire PCJ staff.  The obvious lack of concern by the PCJ personnel for Mr. Benford's life in this case was shocking and nothing less than deliberately indifferent.  ("Opinion 3")

4.  As stated above, because of the blatant disregard for Mr. Benford's medical needs, in my opinion, the PCJ existing policies and procedures regarding inmate medical risks, needs and care are totally inadequate and did not meet the required standards/best practices or the professional standards of care—including the ACA requirements.  This includes (but not limited to) the ACA standards and expected practices as stated below and which are in harmony with all State and Federal codes across the nation:

    •  Staffing: 4-ALDF-2A-15: (Staffing of qualified personnel who can meet medical needs.).
    •  Reception: 4-ALDF-2A-19 and 4-ALDF-2A-21: (Immediate medical screening required.).
    •  Classification & Separation: 4-ALDF-2A-30 and 4-ALDF-2A-32: (Housing according to medical need.).
    •  Training & Staff Development 4-ALDF-7B-08, 4-ALDF-7B-09, and 4-ALDF-7B-10.  (All facility staff require CPR/first aid training.).
    ("Opinion 4")

*Id*. at 9-10.

The ACH Defendants argue that Mr. Clark's report offers opinions that constitute medical conclusions, about which Mr. Clark is not qualified to offer.  The Pemiscot County Defendants contend that Mr. Clark's opinions should be excluded because they are either medical opinions, legal conclusions, conclusory, or irrelevant.

Plaintiffs respond that they agree that Mr. Clark is not a medical expert, nor attorney, and should not attempt to give medical or legal conclusions.  Plaintiffs contend that Mr. Clark is an

5

expert regarding jail standards, policies, and procedures, and his testimony meets the standards needed for testimony on those issues.

As an initial matter, both groups of Defendants argue that Mr. Clark's testimony should be excluded as a general matter because he is merely a "hired gun."  Defendants cite examples of other courts excluding Mr. Clark's testimony.

Mr. Clark worked for the Los Angeles County Sheriff's Department from 1965 until 1993, when he became a self-employed police procedures consultant.  He earned a California Peace Officer Standards and Training ("POST") Advanced Certificate, and graduated from the POST Command College, a master's level two-year course of study in Police Administration. Although other courts have excluded Mr. Clark's testimony for a variety of different reasons, the Court finds that Mr. Clark is qualified to testify as an expert in jail practices and procedures.  *See Olson ex rel. H.J. v. City of Burnet, Tex.*, No. A-20-CV-00162-JRN, 2021 WL 1289376, at *2 (W.D. Tex. Feb. 26, 2021) ("Clark's three decades in and around the field of law enforcement qualifies him by 'knowledge, skill, experience, training, or education' to testify about police practices and procedures in general.").

The Court will next examine Defendants' objections to specific opinions of Mr. Clark to determine their admissibility.

## A.      Opinion 1

First, both the ACH Defendants and Pemiscot County Defendants argue that Mr. Clark provides opinions that constitute medical conclusions.

Plaintiffs agree that Mr. Clark has no medical qualifications and may not provide medical opinions.  Plaintiffs, however, argue that the association between the PCJ's policies and procedures and ACH requires that both entities have knowledge regarding basic medical needs.

They note that ACH provides training to PCJ staff regarding the healthcare needs of inmates, including training on deliberate indifference.

Mr. Clark states that the death of Mr. Benford was "totally preventable." (Doc. 97-1 at 9.) Upon questioning during his deposition regarding whether this was a medical opinion, Mr. Clark references some medical records and the report of Plaintiffs' medical expert, then states, "in my opinion, *to a reasonable degree of medical certainty* that if Mr. Benford had consistent, regular monitoring of his blood pressure and corresponding medical treatment that—then that could have prevented him from experiencing continuous pain and suffering and his early death." (Doc. 97-3 at 17) (emphasis added).

The Court agrees that this testimony must be excluded. Mr. Clark is not qualified to offer opinion testimony as to whether monitoring of Mr. Benford's blood pressure or any other medical treatment could have prevented his death. *See Goode v. City of Southaven*, No. 3:17-CV-60-DMB-RP, 2018 WL 4691330, at *5 (N.D. Miss. Sept. 27, 2018) (excluding law enforcement expert's testimony about connection between prone restraint and positional asphyxia). Mr. Clark may testify that jail standards require more frequent monitoring of blood pressure to the extent that this opinion is based on law enforcement training, policies, or procedures. *See id.* (admitting testimony on whether officers complied with law enforcement standards for positional asphyxia).

The Pemiscot County Defendants also argue that Mr. Clark's opinion that Defendants demonstrated "shocking and deliberately callous disregard" for Mr. Benford's life and safety is an improper legal conclusion. The Court agrees, and Plaintiffs have conceded this issue, representing that Mr. Clark "will *not* provide testimony using the terms, 'deliberate indifference'

or 'deliberately callus' when specifically describing the conduct of the Defendants."  (Doc. 123 at 3) (emphasis in original).

Thus, Defendants' Motion to Exclude will be granted as to Opinion 1, as set out above.

**B.     Opinion 2**

In his second opinion, Mr. Clark states, in relevant part, that "[g]iven the totality of the circumstances and the knowledge PCJ personnel had of Mr. Benford's health disabilities, procedures should have existed that would have, at the minimum, sent Mr. Benford for evaluations of his blood pressure and heart monitoring."  (Doc. 97-1 at 9.)  In his deposition, Mr. Clark testified that a nurse should have taken Mr. Benford's blood pressure "at least daily as part of the protocol; that would be my expectation," and that he would be asking the medical staff, if you don't take it daily, what would be reasonable and why."  (Doc. 97-3 at 25.)  Mr. Clark then remarked that he takes his own blood pressure "daily."  *Id.*

Both groups of Defendants argue that Mr. Clark's statement that Defendants should have sent Mr. Benford for evaluations of his blood pressure and heart monitoring constitute improper medical opinions.  Plaintiffs respond that Mr. Clark's testimony is proper, as it relates to national standards that apply to jail staff when they become aware of medical conditions.

The Court agrees that Mr. Clark may testify regarding national jail standards regarding prisoners with specific medical conditions.  Mr. Clark testified in his deposition that "Missouri Core Jail Standards" are "taught to law enforcement as required by the State of Missouri," and that the core jail standards have provisions regarding detainees with "chronic medical conditions such as diabetes, hypertension, [and] mental illness."  (Doc. 99-2 at 27.)  For example, Mr. Clark testified that these standards require detainees with chronic medical conditions "receive periodic

care by a qualified healthcare provider in accordance with individual treatment plans that include monitoring of medicines and laboratory testing." *Id.*

Mr. Clark may not, however, testify as to the specific medical care required for Mr. Benford's conditions.  As such, Mr. Clark's testimony that Defendants should have taken Mr. Benford's blood pressure "at least daily" is a medical opinion that Mr. Clark is not qualified to provide and will be excluded.  Mr. Clark's statement provided in Opinion 2 that Defendants should have "at the minimum, sent Mr. Benford for evaluations of his blood pressure and heart monitoring" will also be excluded as improper medical testimony.  (Doc. 97-1 at 9.)

## C.    Opinion 3

Mr. Clark's third opinion is directed at the Pemiscot County Defendants, as he indicates that Mr. Benford's "obvious susceptibility to heart attack and/or death was not solely restricted to the PCJ medical staff."  (Doc. 97-1 at 9.)  Mr. Clark states that Mr. Benford's "physical symptoms of distress were so obvious that they were a matter of simple common sense among the entire PCJ staff," and that the "obvious lack of concern by the PCJ personnel for Mr. Benford's life in this case was shocking and nothing less than deliberately indifferent."  (Doc. 97-1 at 9.)

Defendants argue that Opinion 3 provides both medical opinions and legal opinions.  The undersigned agrees.

An opinion is not objectionable just because it embraces an ultimate issue. Fed. R. Evid. 704(a).  However, if the subject matter is within the jury's knowledge or experience, then the expert testimony should be excluded because it does not meet the helpfulness criterion of Rule 702.  *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010).  Opinions that merely tell the jury what result to reach are inadmissible. *Id.*

Mr. Clark's statement regarding Mr. Benford's "obvious susceptibility to heart attack and/or death" is an improper medical opinion.  His statements that Mr. Benford's symptoms were "so obvious" and that the Pemiscot County Defendants' conduct was "shocking and nothing less than deliberately indifferent" are legal conclusions that would not assist the jury.

Accordingly, Mr. Clark's statements provided in Opinion 3 will be excluded.

**D.     Opinion 4**

In his final opinion, Mr. Clark states that, "because of the blatant disregard for Mr. Benford's medical needs," the PCJ policies and procedures regarding inmate medical risks and care are "totally inadequate and did not meet the required standards/best practices or the professional standards of care—including the ACA requirements."  (Doc. 97-1 at 9.)

The Pemiscot County Defendants first argue, and the Court agrees, that Mr. Clark's statement regarding the "blatant disregard for Mr. Benford's medical needs" is an improper legal conclusion.

Next, Defendants contend that Mr. Clark's opinion that PCJ policies and procedures  did not meet the standards of the ACA lacks any foundation or development.  Defendants argue that Mr. Clark only cites the standards but at "no time in Mr. Clark's report or in his deposition does he attempt to apply those blanket generalized standards to Pemiscot County."  (Doc. 132 at 2.)  Instead, Mr. Clark "just lists the alleged standards and conclusions about the County's policies without any type of analysis."  *Id.*

The Court has reviewed Mr. Clark's report and deposition testimony and agrees that Mr. Clark fails to provide an analysis explaining how Pemiscot County's policies conflicted with ACA requirements.  Upon questioning during his deposition as to the specific standards Defendants violated, Mr. Clark explains that he "plugged in the American Correctional

10

Association Protocols" in his report, and that Opinion 4 "ends with those ACA requirements and those are the nomenclatures…" (Doc. 99-2 at 35.) The report, however, fails to provide any analysis explaining how these ACA standards were violated. Mr. Clark's "conclusory statements are unhelpful and inadmissible." *Williams v. City of Houston, Texas*, CV H-16-3342, 2019 WL 2435854, at *6 (S.D. Tex. June 11, 2019) (excluding Mr. Clark's statements as conclusory and unsupported). Thus, Opinion 4 will be excluded.

For these reasons, the Court grants Defendants' Motions to exclude Clark's opinions as set out above from the record, which will be considered in ruling on the Motions for summary judgment.

## II.     Motions for Summary Judgment

As previously noted, both the Pemiscot County Defendants and the ACH Defendants have filed Motions for summary judgment.

### A.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence,* 358 F.3d 982, 985 (8th Cir. 2004). "Instead, the dispute must be outcome determinative under prevailing law."

*Mosley v. City of Northwoods,* 415 F.3d 908, 910-11 (8th Cir. 2005) (internal quotations omitted).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**B.  Facts**[2]

Mr. Benford was a detainee at the PCJ from May 15, 2017, until August 13, 2017.

Rivan Hill, Richard Cobbs, Terry Armstrong, Joan Prater, and Bridget Crooks were corrections officers ("COs") at PCJ during the relevant period.  COs were taught to take vital signs of inmates and document them when a nurse is not present, and how to call the doctor and get directions as to what to do if the nurse is not present.  Joan Prater worked in the control room of the jail.  David Stewart is a jail sergeant at PCJ.  Chad Nixon is a deputy at PCJ and Assistant Jail Administrator.  Josh Bost is the Jail Administrator at PCJ.  Torrance Akins is a deputy sheriff at PCJ.  Ron Warren is a dispatcher and Tommy Greenwell is the Sheriff.

On September 29, 2015, Pemiscot Cunty and ACH entered into an agreement for the provision of inmate health services at the jail.  ACH is an outside company that handles any medical issues in the jail.  Pemiscot County does not hire any nurses or doctors at the jail.

Kristin Tate is the ACH nurse at PCH and she is responsible for the medical management at the jail.  Ms. Tate works at the jail 40 hours a week, Monday through Friday, from approximately 8:00 a.m. to 4:30 p.m.  Dr. Charles Pewitt is contracted with ACH to provide medical services to PCJ.  Dr. Pewitt goes to the jail one day per week and visits on site

---

[2]The Court's recitation of the facts is taken from both groups of Defendants' Statements of Uncontroverted Material Facts (Docs. 103, 106), Plaintiffs' Responses in Opposition to Defendants' Summary Judgment (Docs. 126, 127), Plaintiffs' Statement of Additional Facts in Dispute in Response to Defendants' Motions for Summary Judgment (Doc. 128), and the ACH Defendants' Response to Plaintiffs' Statement of Additional Facts (Doc. 136), with any disputes noted.

on an as-needed basis, although he is available by phone if there are questions for him.  If an inmate needs medical care, the nurse handles it on site.  If the nurse is not present, the inmate notifies the control center about any medical issues and the inmate will be brought to the booking room to determine if the inmate needs medical treatment.  The jail will call the doctor for further instructions if it is determined the inmate needs medical treatment.

Prior to his incarceration, Mr. Benford saw Abdullah Arshad, M.D., at Pemiscot Memorial Health System for treatment of various impairments, including high blood pressure. Dr. Arshad prescribed Lisinopril, 5 mg daily, to treat Mr. Benford's high blood pressure, in January 2016.  On March 30, 2016, Mr. Benford's blood pressure was 143/93 and 157/85.  Dr. Arshad increased the dosage of Lisinopril to 10 mg.  On May 31, 2016, Mr. Benford's blood pressure was 162/94.  Dr. Arshad changed Mr. Benford's medication to Lisinopril/HCTZ 20/12.5 mg daily.  On January 24, 2017, Mr. Benford's blood pressure was 132/89.  Dr. Arshad stopped the Lisinopril, and prescribed Amlodipine 5 mg and KC1 (potassium chloride) 10 mEq daily. On February 28, 2017, prescriptions were refilled for Lisinopril/HCTZ and Amlodipine, but not KC1.  On April 5, 2017, Mr. Benford's blood pressure was 160/104, and his medications were refilled.  Prescription Drug Store records on April 7, 2017 show prescriptions for KC1 10 mEq ER daily and Amlodipine 10 mg daily.  Mr. Benford's prescription for Hydrocodone was filled pursuant to Dr. Alfredo Romero's order on April 28, 2017.

On May 15, 2017, Mr. Benford was arrested and incarcerated at PCJ.  Mr. Benford was booked into the PCJ by Defendant Hill.  Upon intake at the PCJ on May 15, 2017, Mr. Benford filled out an inmate medical form listing medical conditions he had, including upper and lower back problems, knee injury, surgery on the right ear, and hypertension.  Mr. Benford listed only pain medications for his back on the section of the form asking what medications he was taking.

13

On May 18, 2017, Ms. Tate completed a "Medication Verification Form," at which time Dr. Pewitt approved the Amlodipine and ordered the medical staff to use Mr. Benford's personal Amlodipine until it ran out and then order from the pharmacy.  Dr. Pewitt testified that he believes the only medication he was made aware of was the Amlodipine, which was presented to him by Ms. Tate.  He stated that the PCJ does not allow narcotics.  Dr. Pewitt further testified that he does not know ACH's protocol for hypertension management, and that he does not know who determined Mr. Benford was stable and did not require any monitoring.  Dr. Pewitt stated that some important factors to consider for controlled hypertension include obesity, diabetes, and blood pressure.  Defendants Pewitt and Tate both testified that they received no training from Defendant ACH.

Plaintiffs' expert pathologist, Wayne Ross, M.D., testified that one of Mr. Benford's other medications prescribed by Dr. Arshad—Fioricet—can cause low potassium, or hypokalemia.  He stated that potassium is a life-saving medication if a person is hypokalemic. Dr. Ross further testified that chronic pain, including untreated chronic pain, contributes to high blood pressure.

All medications in the jail are scheduled.  The nurse packages medications and if a medication from a family member is brought to the jail, the nurse makes sure it is not expired and takes it over from there.  Any medications brought into the jail must be reviewed by the jail doctor to determine whether the inmate may have them.  The nurse is unable to give authority for certain prescriptions without the doctor being involved.  Ms. Tate passes the medications to the inmates in the mornings, Monday through Friday.  If the nurse is not present at the jail, a CO is assigned to administer the medication to the inmates.

If an inmate has a medical complaint or needs to request medical care, the inmate may complete a medical request form or submit a medical request in the kiosk system at the jail. Inmates may also request medical care by declaring an emergency.  The medical protocol at PCJ is determined by ACH, not the jail.

The Medication Administration Records ("MAR") for the PCJ show that Amlodipine 10 mg was given to Mr. Benford daily from May 18th to May 30th.  Prescription Drug Store records show refills on May 31, 2017, including Amlodipine and KC1.  Ms. Tate took Mr. Benford's vital signs on June 2, 2017, and noted his blood pressure was 128/70 and within normal limits. The ACH Defendants contend that their records show Amlodipine was given to Mr. Benford daily from June 1thru June 30; July 1 thru July 31; and August 1 thru August 13.  Plaintiffs dispute that Mr. Benford received his Amlodipine on all of these dates, and note that Mr. Benford complained to his cellmate, Mr. Thomas, that he did not receive his medication on time all the time.  (Doc. 103-6 at 41.)  Additionally, Mr. Benford reported to his mother, Plaintiff Annie Oliver, on May 31st that he had not received his medication in three to four days, and asked Ms. Oliver to bring his medication to the jail.  During a June 2, 2017, telephone call, Mr. Benford told Ms. Oliver that he did not receive the medication she dropped off at the jail until the day after it was delivered.

Mr. Benford never completed a medical request during his approximately three months of incarceration.  He used the grievance system only one time, when he reported that another inmate stole money from his account.

On August 13, 2017, at approximately 4:15 p.m., inmate John Thomas hit the call button stating that his roommate in D-B 7 was unresponsive and "cool to the touch."  (Doc. 103-6 at 41.)  CO Hill called Sergeant Stewart to check on Thomas's roommate, who was Mr. Benford.

15

Stewart had never met Mr. Benford.  Stewart arrived at the cell at 4:20 p.m.  Hill also went to the jail cell to check on Mr. Benford, arriving two minutes after Stewart.  Ms. Prater, who was in the control center, had dispatch call an ambulance when she was advised of a man down.  The first EMS responder arrived at 4:33 p.m.  Mr. Benford was slumped on the lower bunk of his cell and was deceased.  Stewart checked for a pulse and heartbeat, and found no response or pulse.  An autopsy report revealed Mr. Benford died as a result of coronary artery disease.

There is no evidence that the Pemiscot County Defendants knew that Mr. Benford had coronary artery disease.  The parties dispute whether the Pemiscot County Defendants knew that Mr. Benford complained of chest pains or feeling ill on the day he died.  Plaintiffs note that Defendant Nixon's Supplemental Report includes a summary of his interview of inmate Mark Jones, wherein Nixon reports, "Jones stated that he had witnessed Benford on the intercom asking for medical attention numerous times and requesting medications."  (Doc. 103-6 at 45.)  Nixon's report also indicates inmate Colby McCollum stated he woke up at 3:30 p.m. and saw Mr. Benford leaning against the rail on the second tier, and Mr. Benford advised him that he "felt fine but his chest was hurting."  *Id.* at 45.

### C.  Discussion

As previously noted, the Pemiscot County Defendants and the ACH Defendants have filed separate Motions for summary judgment.  Plaintiffs filed a Consolidated Memorandum in Opposition to the Motions.  (Doc. 125.)  The Court will similarly discuss the two Motions together.

### 1.   Deliberate Indifference (Claim I)

Plaintiffs' first claim asserts a Fourteenth Amendment Due Process violation against all Defendants under 42 U.S.C. § 1983, for failure to provide medical care to Mr. Benford.

16

Defendants argue that there is no evidence that they knew of the serious medical needs of Mr. Benford and deliberately disregarded them or acted with a conscious disregard for Mr. Benford's health.  They next contend that Plaintiffs have failed to produce medical evidence that any deliberate indifference on their part was the cause of Mr. Benford's death.

At all relevant times, Mr. Benford was a pretrial detainee, meaning his constitutional claims arise under the Fourteenth Amendment.  *See Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010).  The Fourteenth Amendment provides at least as much protection to pretrial detainees as the Eighth Amendment does to convicted prisoners.  *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).  Accordingly, a pretrial detainee's medical claims are analyzed under the Eighth Amendment's deliberate indifference standard.  *See Grayson v. Ross*, 454 F.3d 802, 808 (8th Cir. 2006).  Under the Eighth Amendment, the government has an obligation to provide medical care to those whom it is punishing by incarceration.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To demonstrate constitutionally inadequate medical care, an inmate must show that a prison official's conduct amounted to deliberate indifference.  *Dulany v. Carnahan*, 132 F.3d 1234, 1237-38 (8th Cir. 1997).

To establish deliberate indifference, a plaintiff must show that he suffered from an objectively serious medical need, and that prison officials actually knew of and disregarded that need.  *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019); *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).  "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).  An inmate must demonstrate that a prison health care provider's actions were "so inappropriate as to evidence

intentional maltreatment or a refusal to provide essential care." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021).  In other words, "deliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017); *see also Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) ("plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the arrestee's health").

Deliberate indifference can include the intentional denial or delay of access to medical care, or the intentional interference with treatment or prescribed medication. *Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995); *see also Davis v. Buchanan County, Missouri*, 11 F.4th 604, 624 (8th Cir. 2021).  But a showing of deliberate indifference requires more than a mere disagreement with treatment decisions and is greater than gross negligence. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).  "Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." *Jackson v. Buckman*, 756 F.3d 1060, 1065-66 (8th Cir. 2014) (citing *Fourte v. Faulkner Cty.*, 746 F.3d 384, 387 (8th Cir. 2014)).  Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation. *Gibson,* 433 F.3d at 646.

### a. ACH Defendants

Plaintiffs argue that genuine issues of material fact exist to dispute the ACH Defendants' assertions that they did not violate Mr. Benford's Eighth and Fourteenth Amendment rights. Plaintiffs state that Mr. Benford was age 52, had a known history of diagnosed hypertension, was prescribed multiple medications to treat his hypertension, and was considered overweight.  Dr. Pewitt "inexplicably does not inquire about the risk factors relevant to Mr. Benford," despite testifying that he relies on these factors to determine if a patient should receive consistent monitoring.  (Doc. 125 at 10.)  Instead, Plaintiffs argue that Dr. Pewitt simply relied on the

judgment of Defendant Tate, who "did not consider Mr. Benford's diagnosis and medication as forming a basis for believing that Mr. Benford had hypertension as a chronic condition." *Id.* Plaintiffs argue that Dr. Pewitt either decided to stop Mr. Benford's pain medications and potassium, or Defendant Tate never told him about them.  They note that Defendant Pewitt never determined why Dr. Arshad prescribed the potassium.  Plaintiffs argue that Defendant Tate waited three weeks to consider acting on Mr. Benford's chronic condition.  They conclude that the ACH Defendants demonstrated deliberate indifference through their practice of denying patients adequate medical care, and that this deliberate indifference to the medical care of Mr. Benford led to his early death.

The Court finds that Plaintiffs have failed to establish that the ACH Defendants acted with deliberate indifference to the treatment of Mr. Benford's hypertension.  It is undisputed that Dr. Pewitt approved the Amlodipine that had been prescribed by Dr. Arshad to treat Mr. Benford's hypertension.  Ms. Tate administered Mr. Benford's Amlodipine each morning beginning May 18, 2017.  Plaintiffs note Mr. Benford reported to his mother in recorded telephone conversations that he missed three to four days of his medication on May 31, 2017, and that his medication was not given to him until the day after Ms. Oliver brought it to the jail on June 2, 2017.  (Plaintiffs' Exhibits 15, 16.)  The ACH Defendants dispute that Mr. Benford missed these dosages of his medication.  *This fact is immaterial, however, as these missed dosages of medication are not a basis of Plaintiffs' deliberate indifference claim.*

Ms. Tate took Mr. Benford's vital signs on June 2, 2017, and noted his blood pressure was 128/70, which was within normal limits.  (Docs. 103-2 at 3, 103-7.)  Dr. Pewitt never saw Mr. Benford.  Significantly, Mr. Benford never requested medical treatment by completing a medical request form or by using the jail's kiosk system during his incarceration at the PCJ.

Similarly, he never used the grievance system to complain about his medical care.  Plaintiffs cite the testimony of inmate Mark Jones that he had witnessed Mr. Benford ask for medical attention "numerous times," and request "medications."  (Doc. 103-6 at 45.)  Mr. Jones does not allege that Mr. Benford declared an emergency on any of these occasions.  Plaintiffs do not dispute that Mr. Benford never formally requested medical treatment or formally complained about his medical care during his incarceration at the PCJ.  As such, Plaintiffs have failed to raise a genuine issue of material fact that the ACH Defendants had knowledge of and disregarded a serious medical need of Mr. Benford's.

Plaintiffs argue that Dr. Pewitt should have contacted Dr. Arshad to determine why he prescribed the potassium, and should have checked Mr. Benford's potassium levels.  Plaintiffs rely on the testimony of Dr. Ross in arguing that potassium is a life-saving medication for someone who is too low on potassium, and too much potassium can lead to cardiac irregularities and death.  Dr. Ross, however, is a forensic pathologist and admitted that the standard of care for a family practice or correctional medicine physician is outside the scope of his expertise.  (Doc. 128-4 at 4.)  He specifically testified that he would *not* offer opinions about the standard of care in the instant case, including whether medications were appropriate.  Dr. Ross is the only medical expert offered by Plaintiffs in this matter.  His testimony does not, therefore, create a genuine issue of fact for trial.  Additionally, Plaintiffs have presented no evidence from Dr. Arshad or any other source that Mr. Benford did in fact suffer from a condition requiring potassium as a "life-saving medication."

Next, the Defendants claim that their alleged failure to properly monitor and treat Mr. Benford's hypertension resulted in a cardiac event and death is a sophisticated injury for which expert testimony is required to show proof of causation.  *See Gibson,* 433 F.3d at 646.  Plaintiffs

have failed to support their claim with a qualified expert opinion demonstrating causation.  *See Robinson v. Hager,* 292 F.3d 560 (8th Cir. 2002) (when prisoner suffered stroke after prison officials failed to provide him with blood pressure medication, the Court held stroke was "a sophisticated injury which could be caused by numerous factors other than lack of medication. Therefore, expert medical testimony is needed to prove causation.")

The ACH Defendants, on the other hand, have offered the expert opinions of the following witnesses: Dr. Grady J. Bazzel, CCHP, a family practice physician specializing in correctional medicine; Dr. Kim A. Klancke, FACC, a cardiologist; and Dr. Jane Willman Turner, MD, Ph.D., a pathologist.

Dr. Bazzel testified that Mr. Benford underwent a  "thorough and timely medical intake" upon entering the PCJ, and the results of this screening were acted upon quickly, "allowing him access to his home medication for hypertension, amlodipine."  (Doc. 103-11 at 3.)  Dr. Bazzel stated that Mr. Benford had begun taking a low dose of potassium on April 7, 2017, approximately six weeks before his arrest.  *Id.*  He testified that the potassium was prescribed to help prevent low potassium, which was a known side-effect of one of Mr. Benford's other medications, lisinopril/HCTZ.  The dosage of potassium given to Mr. Benford was "in the homeopathic range, doing very little if anything beneficial."  *Id.*  Dr. Bazzel expressed the opinion that the potassium was not needed because the lisinopril/HCTZ was not continued during Mr. Benford's incarceration.[3]  *Id.*  He noted that Mr. Benford's blood pressure on June 2, 2017, reflected good control of his hypertension after having been in the jail for several weeks.

---

[3] Plaintiffs dispute that Dr. Arshad prescribed the potassium to prevent side effects of the HCTZ, noting that he continued to prescribe potassium after he stopped prescribing HCTZ.  This dispute is immaterial, as Plaintiffs have offered no evidence to support their claim that the potassium was a necessary, "life-saving medication."

*Id.* Dr. Bazzel stated that based on this control, "it is an acceptable practice to check his blood pressure on an as needed, not scheduled, basis or if he were to have placed any requests for medical services." *Id.* He stated that it was not unusual for a patient with controlled blood pressure to have it checked only every six to twelve months. *Id.* Dr. Bazzel concluded that Mr. Benford died from complications of coronary artery disease, and not from being denied any of his medications. *Id.*

Dr. Klancke, Defendants' cardiologist, testified that Mr. Benford died from sudden cardiac death, which was not predictable or preventable by jail staff. (Doc. 103-13 at 2.) The only way to prevent the fatal arrhythmia would have been for Mr. Benford to receive "immediate treatment for myocardial ischemia in an acute care facility with advanced care capability." *Id.* Dr. Klancke expressed the opinion that Mr. Benford's death was unrelated to his blood pressure management. *Id.* Further, he testified that the discontinuation of potassium upon incarceration had nothing to do with his death, as the potassium would not play any role in preventing him from developing his acute coronary syndrome or in lowering his blood pressure. *Id.* at 3. Dr. Klancke found that Mr. Benford's hypertension management during his incarceration was "optimal and played no role in his death." *Id.* The standard of care did not require blood pressure monitoring more frequently than every three to six months, as recommended by the National Institute of Health. *Id.*

Finally, Defendants' pathologist Dr. Turner testified that Mr. Benford died from "a fatal arrythmia due to chronic ischemic heart disease caused by severe coronary artery disease." (Doc. 103-15.)

Based on the undisputed facts, there is no evidence that Defendants Pewitt or Tate knew Mr. Benford suffered from a serious medical condition and deliberately disregarded it.

Additionally, there is no evidence that any alleged deliberate indifference of the ACH

Defendants caused Mr. Benford's death.   "When there is evidence 'that the care provided was

adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he]

received adequate treatment.'" *Hancock v. Arnott*, 39 F.4th 482, 488 (8th Cir. 2022) (quoting

*Dulany*, 132 F.3d at 1240); *see also Johnson v. Hamilton*, 452 F.3d 967, 972-73 (8th Cir. 2006)

(finding no deliberate indifference against and only mere malpractice where fractured finger was

only initially treated with ibuprofen).  The Eighth Circuit has clearly held that prisoners "do not

have a constitutional right to any particular type of treatment."  *Long v. Nix*, 86 F.3d 761, 765

(8th Cir. 1996); *see also Roebuck v. Glass*, No. 4:18-CV-01498, 2018 WL 6589926, at *2 (E.D.

Mo. Dec. 14, 2018) (finding plaintiff was "demanding his own brand of treatment").

Here, Plaintiffs' claim that the ACH Defendants should have prescribed additional

medications or taken his blood pressure more frequently amount to mere disagreement with

treatment decisions and not deliberate indifference to serious medical needs.

Further, Defendants argue that ACH cannot be liable under § 1983 because the Second

Amended Complaint does not plead a claim for an unconstitutional policy, custom, or procedure

pursuant to *Monell* against ACH.

It is well-established that a private corporation, like ACH, will only be held liable under §

1983 for its own unconstitutional policies – and will not be liable under the doctrine of

*respondent superior* for the actions of its employees.  *Sanders v. Sears, Roebuck & Co.*, 984 F.2d

972, 975-76 (8th Cir. 1993).  To state a claim against ACH, a plaintiff must allege that a policy

or custom of ACH inflicted injury actionable under § 1983.  *Id.* (citing *Monell v. Dep't of Soc.

Servs.,* 436 U.S. 658, 690 (1978)); *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 906 (8th Cir.

2020) (explaining that the "proper test" for determining whether a corporation acting under color

of state law is liable under 42 U.S.C. § 1983 "is whether there is a policy, custom, or action by those who represent...official policy that inflicts injury actionable under § 1983") (internal quotations and citations omitted).  Failure to train is an extension of an unconstitutional practice or custom.  *Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018).

Plaintiffs allege a *Monell* claim only against "All County Defendants" in Claim V.  (Doc. 27 at 24.)  Plaintiffs admit that their *Monell* claim is directed against only the Pemiscot County Defendants, and not ACH, in their Response to the ACH Defendants' Statement of Uncontroverted Material Facts.  (Doc. 127 at 3.)  Plaintiffs nonetheless contend that ACH can be held liable for the constitutional violations arising out of their failure to adequately train or supervise their subordinates.  Plaintiffs contend that the record demonstrates that ACH, while required to supervise and monitor its staff, provided no oversight and no training to Defendants Pewitt and Tate during their entire tenure under ACH employment.

As previously noted, ACH may be held liable for its failure to train or supervise, only if such failures "inflicted injury actionable under § 1983."  *See Sanders*, 984 F.2d at 975-76; *Stearns*, 957 F.3d at 906.  Plaintiffs have introduced evidence supporting their claim that ACH did not provide training to Pewitt or Tate, and that Pewitt was unaware of ACH polices regarding management of chronic hypertension.  Plaintiffs cannot, however, demonstrate that any lack of training or procedures *inflicted an actionable injury*.  Instead, Defendants' experts have testified that Mr. Benford died from complications of coronary artery disease and not from being denied medications or due to any other conduct by Defendants.  Plaintiffs have not offered any expert opinions to dispute these findings.  Thus, even if ACH had pleaded a separate *Monell* claim against ACH, such claim would fail.

Accordingly, the Court will grant the ACH Defendants' Motion for Summary Judgment as to Plaintiffs' deliberate indifference claim asserted in Claim I.

### b.   Pemiscot County Defendants

Defendants argue that there is no evidence that the Pemiscot County Defendants knew of the serious medical needs of Mr. Benford and deliberately disregarded them or acted with a conscious disregard for Mr. Benford's health.  They further argue that Plaintiffs have not produced any evidence that any deliberately indifferent conduct was the cause of Mr. Benford's death, as any medical evidence produced by Plaintiffs was directed solely at the ACH Defendants.  Defendants note that Plaintiffs' only medical expert, Dr. Ross, stated that he was not providing any opinion regarding the conduct of the Pemiscot County Defendants.

Plaintiffs respond that summary judgment should be denied because Plaintiffs have submitted testimony from fellow inmates who witnessed Mr. Benford asking Defendants for assistance through the intercom throughout the day on which he died, but he received no help. Specifically, inmate Mark Jones reported to Officer Nixon that he observed Mr. Benford "on the intercom asking for medical attention numerous times and requesting medications."  (Doc. 103-6 at 45.)  Inmate Colby McCollum reported that he woke up at 3:30 p.m. and saw Benford "leaning against the rail on the second tier."  (Doc. 103-6 at 45.)  Mr. Benford advised Mr. McCollum that he "felt fine but his chest was hurting."  *Id.*  Inmate Billy Willis stated that he thought he witnessed Mr. Benford on the intercom trying to get medication "but stated he witnessed him take medications earlier in the day."  *Id.* at 46.  Plaintiffs further argue that when the Pemiscot County Defendants were notified of  Mr. Benford's unconscious state, Defendant Prater's reaction was simply, "Okay," and COs did not arrive until five minutes later.  Plaintiffs contend

25

that Mr. Benford's chances of being resuscitated diminished by ten percent during each of those five minutes.

In their Reply, the Pemiscot County Defendants argue that Plaintiffs have ignored Defendants' defense that causation is an element of proof that Plaintiffs cannot establish.  The undersigned agrees.

Plaintiffs must prove that Defendants' deliberate indifference was the cause of Mr. Benford's harm.  *See Gibson,* 433 F.3d at 646; *Robinson,* 292 F.3d at 564.  Dr. Ross, Plaintiffs' only medical expert, testified that he had no opinions as to the treatment, care, or handling of Mr. Benford by the COs in the PCJ, and would not be providing "any opinions concerning how the corrections officers at Pemiscot County handled Mr. Benford from the time of his admittance until his death."  (Doc. 126-2 at 16.)  As such, Plaintiffs are unable to demonstrate that any alleged deliberate indifference on the Pemiscot County Defendants' part caused Mr. Benford's death.

Thus, the Court will grant the Pemiscot County Defendants' Motion for Summary Judgment as to Plaintiffs' deliberate indifference claim.

## 2. Interference with Familial Relationship (Claim II)

In their second claim, Plaintiffs allege that all Defendants acted to interfere with the familial relationships between Mr. Benford, his mother, and his son in violation of Plaintiffs' Fourteenth Amendment Due Process rights.  Plaintiffs state that the Defendants knew Mr. Benford was the father of at least one child due to his jail intake form, knew that Mr. Benford could not relate to his child while confined in the PCJ, and knew that any relationships would be impaired if Mr. Benford were harmed in jail.  They contend that Defendants nevertheless

26

"intentionally refused Mr. Benford life-saving medical care which they knew he needed."  (Doc. 27 at 21.)

Both groups of Defendants argue that to survive summary judgment, Plaintiffs must set forth facts from which a reasonable jury could find that Defendants' conduct was not an incidental deprivation of Plaintiffs' relationships with Mr. Benford but, rather, was intentionally directed at Plaintiffs' relationships with Mr. Benford.  They contend that Plaintiffs have set forth no such facts.

Plaintiffs respond that they are able to prove that their loss was not merely incidental. They state that Defendants were aware that Mr. Benford had a child and a mother.  With regard to Ms. Oliver, they argue that she was "so connected and involved with her son's health that she endeavored to order, pick up, and deliver his prescription medications."  (Doc. 125 at 16.)

Pleading a plausible familial-relationship claim under § 1983 requires an allegation that the state action was intentionally directed at the familial relationship.  *See Harpole v. Arkansas Dep't of Human Servs.*, 820 F.2d 923, 927-28 (8th Cir. 1987) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."); *See also Reasonover v. St. Louis Cty.*, 447 F.3d 569, 585 (8th Cir. 2006) (rejecting familial-association claim where plaintiff "present[ed] no evidence that defendants had an intent to interfere with the relationship between [plaintiff] and her daughter"); *Singleton v. Cecil*, 176 F.3d 419, 423 (8th Cir. 1999) (en banc) ("A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship."), *quoting Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1440 (10th Cir. 1990).

27

Here, Plaintiffs did not allege in their complaint, or argue in their response in opposition to the motions to summary judgment, that the Defendants' alleged deliberate indifference to Mr. Benford's medical needs was intentionally directed at their relationship with Mr. Benford. Instead, the pleadings allege deliberate indifference that only incidentally impacted Plaintiffs' relationship with Mr. Benford.  This forecloses their claims.  *Accord Gorman v. Rensselaer Cty.*, 910 F.3d 40, 47-48 (2d Cir. 2018) ("Based on the Supreme Court's directive that only deliberate conduct implicates due process, we join the consensus view of the circuit courts: a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship."), *citing Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, th[e] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."); *Russ v. Watts*, 414 F.3d 783, 789-90 (7th Cir. 2005) (en banc) (collecting cases) ("Under any standard, finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court.").

Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Claim 2.

### 3.  Eighth Amendment Deliberate Indifference (Claim 3)

The ACH Defendants argue that summary judgment should be granted as to Claim 3, because it is redundant of Claim 1.

Plaintiffs respond that their third claim alleges that Defendants' acts, omissions, and deliberate indifference towards Mr. Benford's medical condition, inclusive of his right to receive adequate medical care for that condition, resulted in Mr. Benford's death.  They contend that

these allegations are not redundant.  Plaintiffs rely upon *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007), for the proposition that pre-trial detainees may bring deliberate indifference claims under the Fourteenth and Eighth Amendments.

The Eighth Amendment prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.  A prisoner's conditions of confinement are subject to scrutiny under the Eighth Amendment.  *Kahle,* 477 F.3d at 550.  In *Kahle*, the Court held that because Kahle was a pretrial detainee at the time of the alleged violation, his § 1983 claims were analyzed under the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment.  The Court remarked that, "[t]his makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."  *Id.*

Contrary to Plaintiffs' suggestion, *Kahle* does not create two separate causes of action based on the same factual allegations for pre-trial detainees.  Instead, it held that a pre-trial detainee may proceed under the Eighth *or* Fourteenth Amendment.

Moreover, the undersigned has found that Defendants are entitled to judgment as a matter of law on Claim 1, because Plaintiffs are unable to show any of the named Defendants deliberately disregarded a serious medical need of Mr. Benford's *or* that any of Defendants' actions caused Mr. Benford's death.  Thus, regardless of whether Plaintiffs' claim is analyzed under the Eighth or Fourteenth Amendment, it fails.

Accordingly, Defendants' Motion for Summary Judgment will be granted as to Claim 3.

**4.  Conspiracy (Claim 4)**

In their fourth claim, Plaintiffs allege that Defendants conspired to violate Mr.

Benford's civil rights in violation of § 1983.  Plaintiffs state that all named Defendants had a duty to make sure Mr. Benford's medical needs were met, knew his medical needs were not being met, and with a meeting of the minds, took joint action to refuse to provide Mr. Benford access to medical treatment.  As a direct result, Plaintiffs claim that Mr. Benford was denied any chance of survival and died.

Defendants argue that they are entitled to summary judgment on this claim because Plaintiffs have failed to prove a constitutional violation and have failed to prove an actual conspiracy.

"To prove a [42 U.S.C.] § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999); *see Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 782-83 (8th Cir. 2021).  In order to prevail, the plaintiff is required to prove the deprivation of a constitutional right or privilege.  *Riddle v. Riepe*, 866 F.3d 943, 948 (8th Cir. 2017); *see also Draper v. City of Festus, Mo.*, 782 F.3d 948, 953 (8th Cir. 2015).  "Absent a constitutional violation, there is no actionable conspiracy claim." *In re Kemp*, 894 F.3d 900, 910 (8th Cir. 2018).

Here, the Court has found that Plaintiffs have failed to demonstrate that any of the named Defendants deprived Mr. Benford of a constitutional right or privilege.  Plaintiffs have further failed to produce any evidence of a conspiracy.  Thus, the Court will grant Defendants' Motion for Summary Judgment as to Claim 4.

**5.** *Monell* **Claim (Claim 5)**

Plaintiffs' fifth and final claim is directed at the Pemiscot County Defendants only. The Second Amended Complaint alleges that the Pemiscot County Defendants "have a de facto policy, custom or practice of failing to provide legally required and medically necessary care to detainees in the Jail in violation of their constitutional rights." (Doc. 27 at 25.)

Defendants argue that they are entitled to summary judgment because Plaintiffs have not alleged any deprivations of their constitutional rights, nor have they introduced any evidence of other constitutional deprivations occurring at the PCJ.

Plaintiffs do not address this claim in their response in opposition to the motions for summary judgment.  The Eighth Circuit recently affirmed that a plaintiff waives his or her claim by failing to oppose arguments on summary judgment "because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) (citation omitted).

Even if Plaintiffs had not waived their *Monell* claim, Defendants have demonstrated they are entitled to summary judgment on this claim.  The Eighth Circuit has "long held that neither municipal nor supervisory liability may attach in § 1983 actions unless individual liability is first found on an underlying substantive claim." *Schoettle v. Jefferson County*, 788 F.3d 855, 861-62 (8th Cir. 2015).  "Because [Plaintiffs] failed to establish [Defendants] violated [Plaintiffs]' constitutional rights, [Plaintiffs] cannot maintain this action against" the Pemiscot County Defendants. *Id.*

Thus, the Court will grant Defendants' Motion for Summary Judgment as to Claim 5.

**<u>CONCLUSION</u>**

The analysis above is not intended to minimize the fact that there has been a loss of life.  The Court recognizes that Mr. Benford's death represented a significant loss to various individuals and extends sincere condolences to those impacted by that loss.  Application of the law in this matter requires that the Motions to Exclude Testimony be granted in part, and that the Motions for summary judgment be granted.

Accordingly,

**IT IS HEREBY ORDERED** that the ACH Defendants' Motion to Exclude Testimony (Doc. 96) is **granted in part**, as set out in this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Pemiscot County Defendants' Motion to Exclude Testimony (Doc. 99) is **granted in part**, as set out in this Memorandum and Order.

**IT IS FURTHER ORDERED** that the ACH Defendants' Motion for Summary Judgment (Doc. 102) is **granted**.

**IT IS FURTHER ORDERED** that the Pemiscot County Defendants' Motion for Summary Judgment (Doc. 105) is **granted**.

A separate Judgment in favor of Defendants will accompany this Memorandum and Order.

Dated this 14th day of September, 2023.

s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE